


FILED

Dec 16 2025, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Taylor Mitchell Fischer,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

December 16, 2025

Court of Appeals Case No.
25A-CR-494

Appeal from the Vanderburgh Circuit Court

The Honorable Celia M. Pauli, Magistrate

Trial Court Cause No.
82C01-2310-F1-6210

**Opinion by Judge Brown**
Judges Felix and Scheele concur.

**Brown, Judge.**

[1] Taylor Mitchell Fischer appeals his convictions for neglect of a dependent resulting in death as a level 1 felony and two counts of neglect of a dependent as level 6 felonies.[1] We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2] Fischer and Kaytlen Dossett had one child together, C.F., born in September 2022. They lived together in a house in Evansville along with Dossett's two young sons, A.L. and B.D. A.L. and B.D. slept on the main floor of the home and Fischer, Dossett, and C.F. slept in the basement. On September 11, 2023, Dossett called 911 to report that eleven-month-old C.F. was not breathing. Evansville Police Officer Ryan Andrews arrived at the scene, and Fischer let him into the home. Fischer led Officer Andrews to the kitchen where Dossett was holding C.F., who was "motionless, unconscious, not breathing, [and] starting to turn purple in the face." Transcript Volume II at 244. Officer Andrews took C.F. "directly out to the AMR ambulance that was already on the scene." *Id.*

[3] Paramedic Janel Sheridan received C.F. at the ambulance and observed that "[h]is hands and feet were mottled, which means that they were dark color like blood settling. He was blue around the mouth and extremely, extremely pale

---

[1] Fischer was also convicted of possession of methamphetamine as a level 6 felony, possession of a controlled substance as a level 6 felony, and possession of paraphernalia as a class C misdemeanor. He does not challenge those convictions.

and ashen" and his body was "flaccid." *Id*. at 248. C.F.'s condition indicated "decreased circulation or lack of circulation entirely" and "lack of oxygen being moved around the body." *Id.* C.F. had no pulse, and Sheridan believed that he was already "dead." *Id.* Sheridan performed lifesaving efforts; however, C.F.'s condition did not improve. Sheridan did not administer naloxone (Narcan) to C.F. as she had no reason to believe that drug overdose was the cause of C.F.'s condition.

[4] Meanwhile, additional Evansville Police officers who arrived at the scene "immediately smelled the odor of marijuana upon entering the residence." Transcript Volume III at 12. In the basement area, officers observed a glass smoking pipe with burnt residue in plain view on the bed in the bedroom. Officers also located foil wrappers containing a white crystal substance, pieces of foil with burnt residue, a clear plastic bag with brown powder, a clear plastic bag with residue, a plastic bottle of pills, a black scale, a firearm, and a plastic bag containing a green leafy substance.[2] Most of the items were found in a dresser located in the bedroom; however, the foil with burnt residue, plastic bag with brown powder, and plastic bag with residue were located in what "looked like a normal soda can" that said "Yeti" on it and had a top that "you could actually unscrew" and "store stuff inside." *Id*. at 52.

---

[2] The record reveals that, after observing the glass pipe in plain view, officers obtained a warrant to search the residence during which they found the additional items.

[5] Following the search, Fischer asked Detective Jonathan Oakley if he "would go outside so [Fischer] could speak to [him]," and, when out in the front yard, Fischer stated "that the pipe in the house was his . . . and that he had been a previous drug user and that he was clean." *Id*. at 97, 99. Detective Paul Klein, the lead detective on the scene, also spoke briefly with Fischer while at the home and believed "he was under the influence of drugs or narcotics." Transcript Volume V at 90. Specifically, Detective Klein noticed that Fischer had "slowed speech, droopy eyelids" and "just overall slow responses to statements and questions." *Id*. at 91. Detective Klein had those same observations of Fischer during a subsequent interview at the police station.

[6] During the interview at the police station, when asked where C.F. generally slept, Fischer "mentioned a crib, a sofa, and a mattress." *Id*. at 93. When asked about the location of the crib, Fischer admitted that it was put away in the unfinished portion of the basement. State's Exhibit 12 at 1:42. Fischer indicated that C.F. took "naps on the couch." *Id*. at 1:49-1:50. Fischer stated that, at the time C.F. was "found unresponsive," Fischer was asleep in the bedroom while C.F. had been sleeping on the couch with Dossett sitting next to him watching television. *Id*. at 6:20. Fischer admitted that the glass smoking pipe was his, but he denied that he or Dossett had smoked marijuana that evening. Fischer further admitted that the foils with residue on them were his, that the dresser was where he kept all his things, and that the Yeti can and everything in it belonged to him. Testing revealed that one of the foils found in the Yeti indicated the presence of fentanyl and xylazine. Testing of the clear

plastic bag with residue indicated the presence of fentanyl and diphenhydramine. The bag with brown powder indicated the presence of melatonin, and the plastic bag with a blue foil held a substance that tested positive for methamphetamine. The smoking pipe contained fentanyl.

[7] C.F. died at the hospital. On September 12, 2023, Forensic Pathologist Christopher Keifer performed an autopsy on C.F.'s body at the direction of the Vanderburgh County Coroner's Office. The Coroner's Office directed him to obtain toxicology results on C.F. Specifically, to obtain toxicology on the infant, the "chest was opened and a needle was used to draw blood from near the heart." Transcript Volume IV at 9. Keifer then placed the blood "in a special tube that has a preservative that's used for blood drawn from deceased individuals." *Id.* at 10. The tube was "labeled with the case number and the decedent's full name, time of the autopsy, time of the blood draw"; placed in "a plastic bag that seals up"; placed in a small cardboard box with the form that has . . . the person's full name, time of the autopsy, case number"; and the cardboard box, known as the "toxicology kit," was sealed and placed in a "FedEx airmailer" to be sent to the NMS Laboratories in Pennsylvania. *Id.* at 10-11. The airmailer then sat "in a refrigerated environment . . . until the next pickup by FedEx . . . in most cases, that means the next business day." *Id.* at 11. The refrigeration unit is "a secured facility within the coroner's office." *Id.* After placing the samples in the toxicology kit, Dr. Keifer had no more contact with the samples.

[8] NMS received the blood samples on September 12, 2023. An unidentified analyst from the NMS laboratory in Pennsylvania tested C.F.'s blood and found it to contain 8.1 nanograms per milliliter of fentanyl, 12 nanograms per milliliter of xylazine, and 1.6 nanograms per milliliter of 4-ANPP. The analyst also found the presence of naloxone (Narcan) and recommended a "more definitive technique" be used to confirm that result. State's Exhibit 11.

[9] On October 4, 2023, NMS Forensic Toxicologist Dr. Brianna Peterson, who was not involved in the actual testing, reviewed the results and completed a toxicology report remotely from Seattle, Washington. Among other things, the report indicated the presence of a fatal level of fentanyl in C.F.'s blood as well as a presumptive positive result for the presence of naloxone (Narcan). The results were shared with the Vanderburgh County Coroner and the Prosecutor's Office.

[10] On October 6, 2023, the State charged Fischer with neglect of a dependent resulting in death as a level 1 felony, three counts of neglect of a dependent as level 6 felonies, possession of methamphetamine as a level 6 felony, possession of a controlled substance as a level 6 felony, possession of marijuana as a class A misdemeanor, and possession of paraphernalia as a class C misdemeanor. On October 13, 2023, an unidentified analyst updated the toxicology report that corrected the gender of C.F. from female to male and also included additional test results for electrolytes. Dr. Peterson reviewed and signed the updated report on November 3, 2023.

[11]   On June 3, 2024, the court set the case for a jury trial to begin on November 18, 2024.  The State contacted NMS regarding subpoenaing Dr. Peterson to testify regarding her toxicology report; however, Dr. Peterson was unavailable to testify.  Accordingly, the case was reassigned to NMS Forensic Toxicologist Dr. Justin Brower.  On October 21, 2024, the State subpoenaed Dr. Brower to appear for trial and, on October 25, 2024, Dr. Brower completed a toxicology report remotely from Raleigh, North Carolina, which indicated the exact test results and interpretation as the October 2023 report completed by Dr. Peterson.  On October 28, 2024, the State shared Dr. Brower's toxicology report with Fischer's counsel by email.

[12]   A four-day jury trial began on November 18, 2024.  At the start of trial, the State moved to dismiss one of the level 6 felony neglect of a dependent charges, which the trial court granted.  After jury selection, as the court was addressing several motions in limine filed by the defense, including one requesting exclusion of any reference to lab reports because the State would be unable to lay a foundation for admission of those reports, the State revealed that it planned to call Dr. Brower as a witness to testify about the toxicology report prepared by him.  Fischer objected to the admission of Dr. Brower's toxicology report on multiple grounds including that: the State failed to disclose Dr. Brower as a witness in violation of Ind. Criminal Procedure Rule 2.5; the State failed to file notice of its intent to introduce the laboratory test results pursuant to Ind. Code § 35-36-11-2; the report was inadmissible hearsay; and the report violated his Sixth Amendment right to confront witnesses because the report

was testimonial hearsay from an absent analyst. The trial court overruled the objections but took defense counsel's foundational challenge under advisement.

[13] During a hearing outside the presence of the jury, Dr. Brower testified and explained why there were multiple toxicology reports in this case, including the one he completed shortly before trial, stating that it is "very common" for toxicologists to be unavailable for trial and cases are "reassigned." Transcript Volume III at 139. He explained that when a case is assigned to him, he looks at chain of custody documents and the requisition form to make sure all of the information is correct and matches. He stated that he looks at all of the raw data obtained by the lab to make sure the testing was done in accordance with NMS's standard operating procedures. He noted that, in preparing this particular report, he "independently review[ed] all data from scratch." *Id.* He described his process of reviewing the results in this particular case in order to "assure [him]self that everything [was] correct." *Id*. at 143. He emphasized, "I mean, my name is on that toxicology report and it's my duty to make sure that everything is 100% accurate before I release it[.]" *Id.* When characterizing C.F.'s toxicology report, Dr. Brower stated, "That's my report." *Id*. at 145. He explained that before toxicology testing results reach him, the results are "reviewed by three people," those being the "analyst and then usually two department supervisors or managers." *Id*. at 149. He explained that, after reviewing all of the data, and feeling assured that "everything is correct and accurately reported, including names, date of birth . . . all the positive findings,

I electronically release the case, which then puts my signature on it, and then the report goes out to . . . the requesting agency." *Id*. at 148.

[14] Dr. Brower admitted that he "did no physical, analytical testing" of the blood sample in this case. *Id*. at 161. He noted that, as a forensic toxicologist, he does have "some leeway" and if "something doesn't look right" he can generally "do additional testing to make sure that everything is complete and accurate." *Id*. at 167-168. He acknowledged that in this case, the specimens had been discarded by the time he was assigned the case making retesting impossible; however, he emphasized that he did not "see a need to do any retesting at all" here. *Id*. at 169.

[15] At the conclusion of Dr. Brower's hearing testimony, Fischer objected to the admission of his toxicology report on confrontation clause grounds as well as statutory grounds pursuant to Ind. Code § 35-36-11-4. The court ruled that Dr. Brower's toxicology report could be admitted because he was present at trial and had indicated that he had done his own independent review of the data and provided his own opinion as to the toxicology results. Defense counsel requested a copy of NMS Laboratories' standard operating procedures that Dr. Brower had referenced in his testimony. The State indicated that it did not have those procedures and Dr. Brower stated that he could not access those procedures remotely. When defense counsel requested a meeting with Dr. Brower during an evening recess to discuss the procedures, the prosecutor intervened and instructed Dr. Brower that he did not need to meet with defense counsel. The court did not issue a remedy.

[16]     Once the jury returned, the State called numerous witnesses including Dr. Keifer and Dr. Brower. During Dr. Brower's testimony, the State moved to admit his toxicology report. Fischer renewed his previous objections to the report and also argued that the report needed to be redacted because it contained a presumptive positive test for naloxone but no confirmatory test. The court overruled Fischer's objections and admitted the unredacted report. Dr. Brower testified about the specific quantities of fentanyl, xylazine, and 4-ANPP found in C.F.'s blood. He also testified that C.F.'s blood tested presumptively positive for naloxone (Narcan). During cross-examination of Dr. Brower, Fischer moved to admit Dr. Peterson's toxicology reports, the second of which contained the exact same information as Dr. Brower's report. The reports were admitted without objection. Defense counsel questioned Dr. Brower extensively about the multiple toxicology reports and how he did not become familiar or involved with this case until very shortly before trial.

[17]     At the close of the evidence, the State dismissed the possession of marijuana charge. The jury found Fischer guilty of the remaining counts. The court sentenced Fischer to an aggregate term of thirty years.

## Discussion

[18]     Fischer contends "the trial court committed reversible error in letting a witness be an in-court mouthpiece for blood toxicology results prepared and completed by another analyst." Appellant's Brief at 4. Specifically, Fischer contends that the trial court should have excluded Dr. Brower's testimony as well as his

toxicology report that indicated the presence of a fatal level of fentanyl as well as multiple other substances, including naloxone (Narcan), in C.F.'s blood.[3]

[19] We begin by noting that a trial court has "broad discretion to admit or exclude evidence." *Abbas v. Neter-Nu*, 261 N.E.3d 233, 248 (Ind. 2025) (quoting *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014)). An appellate court will disturb a trial court's ruling only if it amounts to an abuse of discretion, meaning the trial court's decision is clearly against the logic and effect of the facts and circumstances or it is a misinterpretation of the law. *Id.* In the event an error has occurred, we determine if the error is prejudicial by assessing the probable impact the evidence had upon the jury in light of all of the other evidence that was properly presented. *Id.* "A trial court's evidentiary ruling can be affirmed on any basis apparent in the record, regardless of whether that was the rationale upon which the trial court relied." *Id.* (citing *Reeves v. State*, 953 N.E.2d 665, 670 (Ind. Ct. App. 2011), *trans. denied*). Fischer makes four arguments for exclusion, one of which we find dispositive.

[20] Fischer asserts that the court should have excluded Dr. Brower's testimony and his toxicology report due to the State's clear violation of Ind. Code § 35-36-11-

---

[3] We observe that although Fischer claims he is entitled to reversal of all of his "child neglect" convictions, Appellant's Brief at 31, his appeal challenges only the admission of Dr. Brower's testimony and toxicology report regarding the substances found in C.F.'s system and supporting the charge of neglect of a dependent as a level 1 felony. He does not challenge the admission of the substantial evidence supporting his two level 6 felony neglect of a dependent convictions; namely, evidence that showed there were illegal substances that belonged to him found in the home, and that dependents A.L. and B.D. were in the home when those substances were present. Accordingly, we find his challenge to the two level 6 felonies waived.

4. Whether the trial court properly applied this statute—a matter of statutory interpretation—is a pure question of law we review de novo. *D.W. v. State*, 263 N.E.3d 151, 157 (Ind. 2025). "When interpreting a statute, the first step is to give the statute's words their plain and ordinary meaning, considering the structure of the statute in its entirety to promulgate a harmonious reading." *Id*. "In addition, we consider both what the statute does—and does not—say, because we cannot add words or restrictions." *Id*. (cleaned up). "Ultimately, the end goal of construing any statute is to effectuate the intent of the legislature." *Id*. We must also be mindful of the "familiar canon of statutory interpretation that statutes should be interpreted so as to avoid constitutional issues." *J.B. v. State*, 252 N.E.3d 910, 916 (Ind. 2025) (citation omitted).

[21] Both parties acknowledge that the Indiana General Assembly has enacted a statutory scheme governing the introduction of laboratory reports in criminal trials known as the "notice-and-demand" statute. Appellant's Brief at 25, Appellee's Brief at 30. For the purposes of the statute, a "laboratory report" is defined as "a written report or affidavit relating to the results of a scientific test that is prepared for use at trial or to assist a law enforcement investigation." Ind. Code § 35-36-11-1. Ind. Code § 35-36-11-2 provides: "If the prosecuting attorney intends to introduce a laboratory report as evidence in a criminal trial, the prosecuting attorney must file a notice of intent to introduce the laboratory report not later than twenty (20) days before the trial date, unless the court establishes a different time." Ind. Code § 35-36-11-3 provides: "If the defendant wishes for the person who prepared the laboratory report to be present at the

trial for cross-examination, the defendant must file a demand for cross-examination not later than ten (10) days after the defendant receives the notice filed under section 2 of this chapter, unless the court establishes a different time." If the prosecuting attorney is non-compliant, the State cannot "introduce the laboratory report into evidence *without the testimony of the person who conducted the test **and** prepared the laboratory report*." Ind. Code § 35-36-11-4 (emphasis added). If the defendant does not file a demand, he "waives the right to confront and cross-examine the person who prepared the laboratory report." Ind. Code § 35-36-11-5. The United States Supreme Court has observed, "in their simplest form, notice-and-demand statutes require the prosecution to provide notice to the defendant of its intent to use an analyst's report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst's appearance live at trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 326, 129 S. Ct. 2527, 2541 (2009).

[22] The State here admittedly did not file a notice of intent to introduce a laboratory report in accordance with Ind. Code § 35-36-11-2 despite the clear directive that the State "must" do so if the State intends to introduce a laboratory report as evidence in a criminal trial.[4] We agree with Fischer that the plain language of the statute provides that if the prosecuting attorney is non-

---

[4] In its Appellee's Brief, the State concedes it "did not file a notice of intent to introduce a lab report[.]" Appellee's Brief at 30.

compliant with the required notice, the State cannot "introduce the laboratory report into evidence *without the testimony of the person who conducted the test and prepared the laboratory report*." Ind. Code § 35-36-11-4 (emphasis added).[5] It is well established that the words "and" and "or" as used in statutes are not interchangeable, being strictly of a conjunctive and disjunctive nature respectively. *In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008), *trans. denied*. It is undisputed that Dr. Brower is not the person who conducted the test on C.F.'s blood. His unequivocal testimony established that he "did no physical, analytical testing" of the blood sample in this case. Transcript Volume III at 161.

[23]   Moreover, it is arguable that Dr. Brower was not even the person who prepared the challenged laboratory report. Indeed, the October 25, 2024 report, was identical to Dr. Peterson's November 3, 2023, updated toxicology report. Regardless, as it is undisputed that the State failed to give the required notice and that Dr. Brower is not the person who conducted the test *and* prepared the report, the trial court erred in permitting the State to introduce the toxicology report at trial.[6]

---

[5] In response to defense counsel's objection to Dr. Brower's testimony and the report as being "in violation of the statute," the trial court determined that the statute was inapplicable because it "references" a report being admitted "without a witness. There is a witness here." Transcript Volume III at 151-152.

[6] Although we need not decide this issue, to the extent that Ind. Code § 35-36-11-4 refers to "the person who conducted the test and prepared the laboratory report" as presumably the same witness, we note that, in common practice, the person who prepared the report may not always be—or even typically is not—the same person who conducted the test. We observe that in this case, none of the NMS lab reports appear to identify the analyst/analysts who conducted the actual testing on C.F.'s blood, and it appears that NMS's procedure

[24]     Having determined that the trial court erred in admitting Dr. Brower's testimony and the toxicology report based upon the State's failure to follow the statutorily prescribed procedures, we must determine whether reversal is required. The Indiana Supreme Court has explained:

> When an appellate court must determine whether a non-constitutional error is harmless, Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. *See Mason v. State*, 689 N.E.2d 1233, 1236-[12]37 (Ind. 1997); [Edward W. Najam, Jr. & Jonathan B. Warner, *Indiana's Probable-Impact Test for Reversible Error*, 55 Ind. L. Rev. 27, 50-51 (2022)]. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. *See Tunstall v. Manning*, 124 N.E.3d 1193, 1200 (Ind. 2019). Ultimately, the error's probable impact is

---

was to only generate laboratory reports "prepared" by a toxicologist from the raw data. In the scenario presented here, it appears that upon proper notice by the State, and timely demand for confrontation by the defendant, the State would be required to call more than one witness to achieve admissibility of the challenged report.

As this Court has observed in unpublished opinions, the "notice and demand statues simply govern the timing of a confrontation clause objection," *Smith v. State*, No. 92A04-1512-CR-2178, 2016 WL 3460300, at *8 (Ind. Ct. App. Jun. 24, 2016), *trans. denied*, and while the "statutory scheme is not a means for lessening the State's burden of proof," it was enacted as "procedural legislation . . . intended to promote cost savings and efficiency in the trial process." *Hicks v. State*, No. 19A-CR-2168, 2020 WL 4876272, at *3 n.9 (Ind. Ct. App. Aug. 20, 2020), *trans. denied*. Procedural legislation or not, we cannot say the purpose of this statutory scheme is to allow for the admission of a laboratory report through the surrogate testimony of a person who neither conducted the test nor prepared the original report as we have here.

> sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023), *reh'g denied*, *cert. denied*, 144 S. Ct. 570 (2024).

[25] Here, we cannot say that the erroneously admitted toxicology report was harmless. We agree with Fischer that the challenged report was essential to the State's case against him, at least regarding the level 1 felony neglect conviction, and that its admission had a substantial impact on a reasonable average jury. First, the toxicology evidence was essential to establishing C.F.'s cause of death. Dr. Keifer specifically relied upon the report when he testified that upon reviewing "the microscopic slides of the organs," "the toxicology reports," and the Sudden Unexpected Infant Death Investigation Form, he determined that C.F.'s cause of death was "fentanyl intoxication." Transcript Volume IV at 153. Second, the toxicology evidence was essential to proving that Fischer "knowingly" placed C.F. in a situation that endangered C.F.'s life or health as required by Ind. Code § 35-46-1-4(a)(1). By informing the trier of fact that, in addition to having a fatal level of fentanyl in his blood, C.F. had a litany of other drugs in his system, Dr. Brower's testimony about the toxicological findings supported the State's allegation that Fisher knowingly placed C.F. in a dangerous situation. Finally, the erroneously admitted report, as well as Dr. Brower's testimony, presented the jury with the presumptive positive naloxone (Narcan) result. During closing argument, the prosecutor specifically relied upon this evidence to establish Fischer's intent by arguing:

> This Narcan . . . Why is it showing up on his drug screen results? There's no evidence that either [paramedics] or the hospital administered Narcan, so how did it get in his system? You have to administer that. What that means is that [Fischer] recognized that [C.F.] got into that and he then administered that. Narcan is specifically supposed to fight the effects of that drug. And that shows his knowing intent.

Transcript Volume IV at 146. Under the circumstances, Fischer has met his burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding.

[26] For the foregoing reasons, we reverse Fischer's conviction for neglect of a dependent as a level 1 felony and remand for a new trial on that charge. We affirm his remaining convictions.

[27] Affirmed in part, reversed in part, and remanded.

Felix, J., and Scheele, J., concur.

ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Offices
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kathy Bradley
Deputy Attorney General
Indianapolis, Indiana